**Affirmed and Memorandum Opinion filed December 1, 2020.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00449-CV

---

## IN THE INTEREST OF M.J., A CHILD

---

**On Appeal from the 12th District Court**
**Grimes County, Texas**
**Trial Court Cause No. 34836-CCL**

---

## M E M O R A N D U M   O P I N I O N

The trial court terminated a mother's parental rights to M.J. on several predicate grounds, including endangering conduct and endangering conditions or surroundings, as well as because the mother has a mental or emotional illness or mental deficiency rendering her unable to care for her child. The court also found that termination was in the child's best interest. On appeal, the mother challenges the legal and factual sufficiency of all predicate grounds, but she does not contest the court's best interest finding. Because we conclude that legally and factually sufficient evidence supports the district court's finding of endangering conduct, we affirm the judgment.

**Background**

**A.    Pretrial Proceedings**

   1. *The initial referral and investigation*

M.J., a baby boy, was born on June 4, 2019.  Shortly after M.J.'s birth, the Department of Family and Protective Services (the "Department") received a referral, which alleged that appellant, M.J.'s mother ("Mother"), tested positive for phencyclidine ("PCP"), tetrahydrocannabinol ("THC"), and amphetamines based on a drug screen performed six days before M.J.'s birth.  The referral stated that Mother admitted to hospital staff that she had used drugs while pregnant.  According to a urinalysis taken at M.J.'s birth, he did not have drugs in his system, although a later meconium test showed that M.J. tested positive for marijuana.  M.J. was admitted to the neonatal intensive care unit following his birth.

The Department's investigator, Emma Clark, visited M.J. and Mother in the hospital.  A nurse told Clark that the hospital placed Mother under a twenty-four-hour watch due to her erratic behavior, including an attempt to pull the umbilical cord clamp from M.J. contrary to instructions from medical personnel.  The nurse also told Clark that Mother spent a week in a psychiatric care facility prior to being admitted to the hospital to give birth.

Mother admitted to Clark "continual drug use," including the use of methamphetamines to self-treat, Mother said, the pain of her pregnancy.  During Clark's interview, Mother seemed erratic, could not answer questions clearly, and was not concerned about how drugs could affect M.J.

When Clark asked about Mother's plans to care for M.J. after discharge, Mother stated that she did not have any plans.  Clark asked Mother if she had any relatives or friends willing to care for M.J., and Mother named a friend but was

2

unable to provide any other information regarding the friend.  Mother also stated that M.J.'s maternal grandmother possibly could care for M.J.  According to Mother, the maternal grandmother had custody of two of Mother's three other children.  Despite several attempts, Clark was unable to contact the maternal grandmother before the hospital notified Clark that Mother and M.J. were ready to be discharged.  Clark eventually made contact with the maternal grandmother, who initially stated that she would be willing to care for M.J. but then later changed her mind.

### 2. *Mother's history with the Department*

Mother had several interactions with the Department prior to M.J.'s birth and the events of this case.  These included:  (1) an investigation for physical abuse by Mother against her eldest child, a daughter, resulting in a "Reason to Believe" determination by the Department; (2) an investigation for neglectful supervision by Mother regarding her first-born, during which the Department learned that Mother tested positive for marijuana at a pre-natal doctor's appointment and that Mother had a mental health history of anxiety, mood disorder, and schizo-affective disorder; and (3) an investigation for neglectful supervision by Mother regarding her daughter and her second-born son, resulting in findings that Mother and the newborn son tested positive for marijuana.  As referenced above, the maternal grandmother took custody of Mother's two sons prior to M.J.'s birth.

The Department was notified that Mother engaged in other troubling behavior during her pregnancy with M.J.  Approximately three and one half months before M.J.'s birth, the Department received a referral alleging that Mother tested positive for THC, PCP, and amphetamines and that Mother initially denied knowing that she was pregnant when she ingested these drugs but later acknowledged that she knew she was pregnant.  The Department closed with

referral without investigation. Approximately one month before M.J.'s birth, the Department received a referral, alleging that Mother was at a hospital and believed she was in labor. Mother tested positive for THC, PCP, methamphetamines, and amphetamines. Mother stated to hospital staff that "she want[ed] to cut the baby out." Mental Health and Mental Retardation ("MHMR") was called for an evaluation, and the Department closed the referral without investigation. Approximately one week before M.J.'s birth, the Department received two separate referrals. The first referral stated that law enforcement responded to a call regarding Mother having a "psychotic episode" in a fast-food restaurant, during which she appeared to be "coming off methamphetamines" and talking to people who were not there. The second referral alleged that Mother had tested positive for THC, PCP, and amphetamines and admitted to using methamphetamine the day prior. The Department closed both referrals without investigation.

3. *The removal*

Clark stated in an affidavit that she believed there was an immediate and continuing danger to the physical health or safety of the child, due to Mother's habitual use of PCP, THC, and amphetamines. Specifically, Mother's admission of methamphetamine use while pregnant with M.J., the fact that Mother had previously given birth to a child who tested positive for drugs, and Mother's significant mental health issues and erratic behavior all demonstrated an unwillingness or inability on Mother's part to become a safe caregiver for M.J. Three days after M.J.'s birth, the Department sought and received an emergency order naming the Department temporary sole managing conservator of M.J. and thereafter placed M.J. in a foster home, where M.J. stayed through termination trial. The Department also sought an order terminating Mother's parental rights to

4

M.J. and appointing the Department sole managing conservator, necessitating a bench trial on the merits.

## B.     Trial

The Department's first witness was Clark.  Clark testified to the above-described facts prompting the Department's initial referral and investigation, beginning with the report that a child, M.J., had been "born drug exposed."  Near the time of the birth, Mother tested positive for a variety of drugs.

Clark interviewed Mother at the hospital, and she admitted "to countless times before over the years of abusing Methamphetamines as well as throughout her pregnancy."  During Clark's interview, Mother received a phone call.  Mother told the caller "to bring some sweets with her and that they could exchange it in the parking lot if they had to."  Clark suspected that Mother was referring to drugs.

Members of the hospital staff told Clark that Mother attempted to remove a clamp from M.J.'s umbilical cord despite contrary instructions.  Clark also learned that Mother was admitted to a psychiatric hospital prior to giving birth.  Clark found Mother to be erratic and incoherent.

When asked of her plans with M.J. after discharge, Mother "didn't have any plans."  Clark testified that Mother "didn't have clothes or a car seat or any necessities with her whenever she gave birth either. . . .  She didn't have stable housing at the time."

Clark was aware that Mother already had three children removed from her care.  Clark spoke to the children's maternal grandmother, who had custody of Mother's two sons.  The maternal grandmother expressed an unwillingness to serve as a placement for M.J. and stated her belief that M.J. "would be better in foster care."

5

The Department placed M.J. in a foster home, where he "was thriving," and offered Mother visitations with her son. Clark recounted two visitations that caused her concern. During the first, Mother initially interacted well with M.J., but, after being in the restroom for a long time, started exhibiting different behavior. Clark decided to do an instant drug test, and Mother tested positive for methamphetamine. Clark cut a second visitation short, after Mother exhibited nervous tics, "pushed an imaginary man out of the room[,] . . . and started cussing at people."

Adrianna Ruiz, an MHMR caseworker, testified regarding Mother's mental health. Ruiz stated that Mother had been "in and out of" MHMR's system for the preceding eight years. According to Ruiz, Mother was diagnosed with a schizophrenia disorder several years ago. A month prior to giving birth to M.J., Mother was diagnosed with "other specified psychosis," as well as "cocaine use disorder" and "meth use disorder." Ruiz stated that Mother "does have a lot of crisis episodes and she does seem to have a lot of in-patient hospitalizations which usually when you do have those it's because you're unstable, you know. You could be a harm to yourself or others."

M.J.'s maternal grandmother confirmed that Mother was diagnosed with schizophrenia approximately eight years before M.J.'s birth. The maternal grandmother also stated that Mother does not get "as much as she needs to" in terms of psychiatric care and that, while Mother has been prescribed medication, she does not always take it. The maternal grandmother acknowledged Mother's history of drug use. When asked if she had concerns about Mother's ability to care for a baby given the drug use, the maternal grandmother responded, "[Mother] can't do it." Speaking of Mother's two sons, the maternal grandmother testified

6

that she has never thought Mother would be able to care for them and that Mother does not have the ability to take care of herself on a daily basis.[1]

Grimes County Sheriff's Department Sergeant Jim Adkins testified to Mother's criminal history. According to the department's records, Mother was arrested twenty-seven times since 2010, including seven times in the year preceding trial. The charges included criminal trespass, criminal mischief, indecent exposure, possession of controlled substance, and assault. During the year before trial, Mother had spent 176 days in county jail.

Kimberly Kawuki, a caseworker with the Department (alternatively referred to during trial as "CPS"), testified regarding a family service plan that was developed for Mother approximately three months after M.J.'s birth. According to Kawuki, the plan required Mother: to maintain a safe and stable home environment; to allow CPS to do unannounced home visits and notify CPS of address changes; to contact the CPS caseworker at least twice monthly and notify CPS of any contact changes so that CPS could contact Mother; to complete a drug and alcohol assessment and follow the recommendations; to submit to random drug tests by CPS; and to undergo a psychological and/or psychiatric evaluation and follow the recommendations. Kawuki visited Mother once while Mother was in county jail and spoke to Mother three times. In those conversations Kawuki explained to Mother the service plan requirements. However, Kawuki also testified that she did not believe she was able to obtain Mother's signature on the plan and was "not 100 percent" sure that Mother was provided a copy of the plan.

---

[1] The maternal grandmother also explained that Mother's eldest child lives with the child's aunt and that, while Mother retains her parental rights to the child, the aunt does not allow Mother to know where the child lives.

To Kawuki's knowledge, Mother did not perform any of the services included within the plan.[2]

Kawuki testified that: Mother did not offer financial support for M.J. during the pendency of this case; Mother did not regularly visit or maintain contact with M.J.; Mother demonstrated an inability to provide the child with a safe environment; M.J. had been in the managing conservatorship of the Department for no less than six months during the pendency of this case; and Mother failed to complete a court-ordered substance abuse treatment program. Kawuki believed that Mother endangered the child during pregnancy by using drugs, that Mother suffers from a mental or emotional illness or mental deficiency, and that Mother's illness or mental deficiency makes her unable to provide for the physical, emotional, and mental needs of M.J. and will continue to render Mother unable to provide for the child's needs until M.J.'s eighteenth birthday.

Kawuki explained that M.J. was placed with distant relatives, who were providing for all of his needs. Kawuki advocated in favor of the court terminating Mother's parental rights and in favor of M.J.'s kinship caregivers adopting him. Kawuki did not have any concerns about the placement's ability to continue to care for M.J. regardless whether adoption occurred. Another witness, the CASA volunteer, testified similarly that M.J. was thriving in his placement and had bonded with his foster parents. One of M.J.'s foster parents testified that he was doing well in their care and that they wished to adopt M.J. if Mother's parental rights were terminated. The foster parents had recently adopted another child, a

---

[2] Another witness, a volunteer with Court Appointed Special Advocates ("CASA"), testified similarly that Mother said that she was not interested in completing anything on the service plan, that she was interested in going to some parenting classes, but she had no interest in anything else on the plan.

son, and M.J. had bonded with his foster sibling: "they are very loving and it's -- it's a great relationship."

At the conclusion of the trial, the court found clear and convincing evidence that Mother: knowingly placed or knowingly allowed M.J. to remain in conditions and surroundings that endangered the child; engaged in conduct or knowingly placed the child with persons who engaged in conduct and endangered his physical or emotional well-being; constructively abandoned M.J., who had been in the temporary managing conservatorship of the Department for more than six months; and did not comply with the provisions of the court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). The trial court also found that Mother has a mental illness or mental deficiency that renders her unable to provide for the physical, emotional, and mental needs of the child and such illness would continue at least until M.J. was eighteen years old. *See id.* § 161.003. The court further found that termination of Mother's rights was in M.J.'s best interest and that the Department should be appointed temporary managing conservator. *See id.* § 161.001(b)(2). Based on these findings, the court signed a final order terminating Mother's parental rights to M.J.

Mother appeals, challenging the legal and factual sufficiency of the evidence to support each of the predicate findings. She does not challenge the trial court's finding that termination is in M.J.'s best interest. Because we conclude the termination order is supported under at least one predicate ground in section 161.001, we need not address the trial court's finding that termination was also warranted under section 161.003.

**Analysis**

## A.     Standards of Review

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex.

2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Law Applicable to Endangerment as a Predicate Ground

In her first issue, Mother argues the evidence is legally and factually insufficient to support termination under all section 161.001(b)(1) predicate grounds. To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Further, due to the significant collateral

consequences of terminating parental rights under section 161.001(b)(1)(D) or (E),[3] "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d at 237. Thus, when as here a parent challenges predicate termination grounds under either subsection 161.001(b)(1)(D) or (E), or both of those subsections, we must address and detail our analysis under one of those subsections. *See id.* We will address the trial court's finding of endangerment under subsection (E).

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a

---

[3] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." Tex. Fam. Code § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *In re S.R.*, 452 S.W.3d at 360-61; *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being. *See In re L.M.*, 572 S.W.3d at 834 & n.4. Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987). As well, a parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92.

Drug abuse is merely one form of criminal conduct that may jeopardize a child's physical or emotional health and thus constitute endangering conduct. For example, a mother's drug abuse during pregnancy is particularly endangering to an unborn child's physical well-being. *See, e.g., In re A.R.G.*, No. 14-18-00952-CV, 2019 WL 1716262, at *8 (Tex. App.—Houston [14th Dist.] Apr. 18, 2019, no pet.) (mem. op.) (mother's use of illegal drug during pregnancy was evidence of endangering conduct because it exposed the child to possible injury or health risks); *In re J.E.*, No. 14-16-00850-CV, 2017 WL 1274081, at *5 (Tex. App.—Houston [14th Dist.] Apr. 4, 2017, pet. denied) (mem. op.) ("A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child.").

Moreover, a parent's drug abuse after a child is born may be an endangering course of conduct under subsection (E) because it can negatively impact the user's ability to parent in multiple ways, not only by exposing the child to the possibility that the parent may be imprisoned but also because drugs can physically impair a mother's or father's capacity to parent. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *6 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.) ("Drug abuse and its effect on the ability to parent can present an endangering course of conduct.").

C.    **Application**

There is much evidence establishing Mother's repeated and admitted drug abuse. Mother has been diagnosed with "cocaine use disorder" and "meth use disorder." The Department presented uncontroverted evidence that, consistent with these diagnoses, Mother used drugs such as PCP, THC, amphetamines, and methamphetamine during her pregnancy with M.J. Drug abuse during pregnancy is an endangering course of conduct, *see In re A.R.G.*, 2019 WL 1716262, at *8; *In re J.E.*, 2017 WL 1274081, at *5, which in fact harmed M.J. because he tested positive for an illegal substance at birth. Clark testified that Mother did not seem concerned about the potential effect of drugs on M.J.

Mother's drug abuse continued after M.J.'s birth. She tested positive for methamphetamine at least once during a scheduled visitation with M.J. after his removal from her care. According to the record, a fact finder reasonably could have inferred from Clark's testimony that Mother actually ingested methamphetamines during her visit with M.J. Mother knows that she has been diagnosed with a schizophrenia disorder, and the maternal grandmother said

14

Mother "does not always take her medication." Witnesses described instances when Mother has attempted to speak to, or physically interact with, people who do not exist. A mentally ill person with a history of inadequately self-medicating and who abuses drugs in the presence of a child jeopardizes the child's physical and emotional well-being. *See In re J.M.R, Jr.*, No. 14-17-00219-CV, 2017 WL 3567919, at *7 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, pet. denied) (mem. op.) ("The evidence of Mother's drug use, untreated mental illness, and criminal activity amply supports the trial court's unchallenged finding of endangerment under subsection E."); *In re A.S.*, No. 12-16-00104-CV, 2016 WL 5827941, at *6 (Tex. App.—Tyler Sept. 30, 2016, no pet.) (mem. op.) (evidence of mother's mental health issues, extensive Department history, inappropriate mental health behavior, criminal history, and illegal drug abuse supported finding of endangerment under subsection (E)).

Finally, Mother's drug use coupled with other proven criminal convictions and incarcerations subjected M.J. to a probability of being left alone because Mother is in jail, also endangering the child's physical and emotional well-being. Between the date the Department intervened in this case and the date of judgment—just under a full year—Mother was incarcerated for approximately half of that time. The clear and convincing evidence of Mother's criminal conduct and subsequent jail time, and the collective negative effect on her ability to parent M.J., establishes an endangering course of conduct. *See In re A.A.C.*, No. 14-19-00560-CV, 2019 WL 6913327, at *7 (Tex. App.—Houston [14th Dist.] Dec. 19, 2019, no pet.) (mem. op.).

The fact finder could have formed a firm belief or conviction that its endangerment finding under subsection (E) was true. *In re J.O.A.*, 283 S.W.3d at 344; *see also In re C.A.L.H.*, No. 14-16-00899-CV, 2017 WL 830495, at *5 (Tex.

15

App.—Houston [14th Dist.] Feb. 28, 2017, pet. denied) (mem. op.) ("Given the undisputed evidence of Mother's persistent use of illegal drugs during pregnancy and afterwards, and then again during the pendency of this suit when her parental rights were at stake, the trial court had sufficient support for its finding that Mother engaged in a course of conduct that endangered the Child's physical and emotional well-being under [subsection (E)].").

A majority of this court sitting en banc recently held that "a parent's drug use alone, without proof of any causal connection to endangering their children's welfare," is not enough to justify terminating a parent-child relationship. *In re L.C.L.*, 599 S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (en banc). *L.C.L.* does not suggest that reversal is warranted here because we are not relying on Mother's drug use alone to affirm the trial court's endangerment finding, and because the record contains ample evidence of (1) Mother's drug use during her pregnancy with M.J., which caused M.J. to test positively for an illegal substance at birth,[4] and (2) Mother's numerous criminal convictions and incarcerations resulting from both drug-related and non-drug-related offenses. In *L.C.L.*, the court's en banc majority noted the absence of evidence of criminal charges related to the parent's drug use or "proof of threat of incarceration due to alleged drug use." *Id.* at 84-85. Here, both exist. Mother's drug use before and after pregnancy, combined with her substantial criminal history, leads us to conclude that sufficient evidence supports the court's finding under subsection (E).

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights to M.J. was justified under Family Code

---

[4] In *L.C.L.*, there was no evidence that the parent's drug use in that case occurred while the parent was pregnant.

section 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection (E) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsections (D), (N), or (O) findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Mother does not challenge the trial court's finding that termination was in M.J.'s best interest, so we need not address that finding. *See id.*; *In re J.N.G.*, No. 14-15-00389-CV, 2015 WL 5634366, at *8 (Tex. App.—Houston [14th Dist.] Sept. 24, 2015, no pet.) (mem. op.). We overrule Mother's first issue.[5]

**Conclusion**

We affirm the trial court's judgment.

/s/ Kevin Jewell
Justice

Panel consists of Justices Christopher, Jewell, and Zimmerer.

---

[5] Because of our disposition of Mother's first issue, we need not reach her second issue, in which she contends that the evidence is legally and factually insufficient to establish the elements of Family Code section 161.003, an independent basis for termination. *See* Tex. Fam. Code § 161.003(a)(1-5); *C.W. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-17-00890-CV, 2018 WL 2709208, at *9 & n.4 (Tex. App.—Austin June 6, 2018, no pet.) (mem. op) (declining to review sufficiency of evidence supporting termination under section 161.003, because other predicate ground supported trial court's ruling) (citing *In re A.V.*, 113 S.W.3d at 362).